Filed 2/9/22; Modified and Certified for Part. Pub. 3/4/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LA INVESTMENTS, LLC, et al., | B304734 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC544662) |
| v. | |
| RICHARD SPIX et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara Marie Scheper, Judge. Affirmed.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Bartley L. Becker and Kenneth C. Feldman for Defendants and Appellants.

The E. Johnson Law Firm, Erik L. Johnson; Houston Law of California and Troy G. Houston for Plaintiffs and Respondents.

————————————

Defendants and appellants Richard Spix, Deborah Elizabeth Martin, and Law Office of Spix & Martin (collectively, the Attorney Defendants) appeal from a judgment following a jury's verdict finding them liable to plaintiffs and respondents LA Investments, LLC, a California limited liability company (LAI) and Peter Starflinger (Starflinger) (sometimes collectively referred to as plaintiffs) for malicious prosecution. After the trial court determined as a matter of law the Attorney Defendants had no probable cause to maintain a lawsuit in which they represented defendant, Rosa Banuelos (Banuelos), the jury determined the Attorney Defendants acted with malice and awarded compensatory damages and punitive damages. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    The Kevin Action and Underlying Action

Sometime in 2009[1] the Attorney Defendants, on behalf of Banuelos's son, Kevin Banuelos (Kevin), filed an action against 218 Properties, LLC, (218) involving a disputed determination that Kevin was not financially eligible to rent a mobilehome space (Kevin Action).

While the Kevin Action was pending, on June 26, 2010, Banuelos entered into a contract to sell her mobilehome in Park

---

[1] We cannot locate the exact date in the record on appeal. As will be seen, appellants have provided neither a complete record, nor adequate citations to the record. It is appellants' burden to provide an adequate record on appeal. (*Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794.) To the extent the record is inadequate, we make all reasonable inferences in favor of the judgment. (*Ibid.*)

Granada Trailer Lodge (Park)[2] to Rosa Rodriguez for $55,000. 218 owns the Park and LAI owns 100 percent of the membership interest in 218. Rodriguez submitted an application for residency at the Park in connection with the contract. The application included paystubs showing monthly gross income of $4,000, but Rodriguez's credit report showed she owed $5,112 per month in loan payments.

On July 2, 2010, 218 attorney Douglas Beck sent a letter to Rodriguez asking for additional information in support of her application for residency (Beck Letter). The Beck Letter requested three categories of documents: (1) a schedule of real estate owned, mortgage statements for each mortgage loan, and a schedule of gross income, expenses, and net income for the years 2009 and 2010; (2) verification of funds to complete the $55,000 purchase of Banuelos's mobilehome; and (3) written confirmation Rodriguez intended to reside in the mobilehome and she did not intend to rent to her son or anyone else.

Rodriguez did not respond to the Beck Letter and on July 7, 2010, exercised her right to cancel the purchase because she did not want to provide the documentation requested.

About a week later on July 15, 2010, Banuelos submitted a declaration in the Kevin Action in support of Kevin's request for a preliminary injunction seeking, inter alia, an order that the mobilehome park must receive permission from the trial court before denying approval of any lease transfer. Banuelos attached three exhibits to her declaration: (1) a June 28, 2010 notice to prospective tenant(s) of Park Granada advising the mobilehome

---

[2] The Park is also referred to as Park Granada Mobile Home Park.

park was in the process of being converted to condominiums (Notice); (2) the July 2, 2010 Beck Letter; and (3) a July 14, 2010 letter from the City of Carson to LAI stating the application to approve the conversion had been denied (City of Carson Letter).

Banuelos declared her mobilehome in the Park had been listed for sale for about four months and Rodriguez had entered into an agreement to purchase it. She stated about one week before escrow was to close, Rodriguez backed out of the transaction, forcing her to cancel the escrow. She also stated there was no application to convert to condominiums pending for the Park.

On July 20, 2010, five days after Banuelos filed her declaration in the Kevin Action, the Attorney Defendants, on behalf of Banuelos, filed an action for declaratory and injunctive relief, statutory violations, interference with contractual and economic advantage, and intentional and negligent infliction of emotional distress (Underlying Action). They named 218 and LAI as defendants. The gravamen of the complaint was 218 and LAI had attempted to prevent mobile homeowners from exercising their rights to sell their mobilehomes to anyone other than the defendants or their proxies. Banuelos alleged Starflinger, a manager of the Park, retaliated against her saying he was not going to make selling her mobilehome easy because he had spent more than $250,000 in legal fees litigating against her son. Banuelos alleged the sale to Rodriguez fell through because of the unreasonable conduct of the Park in withholding approval of buyers. Banuelos attached to the complaint the same three exhibits she attached to her declaration filed in the Kevin Action.

Meanwhile, on July 29, 2010, 218 filed its opposition to the motion for preliminary injunction in the Kevin Action, along with

4

the declarations of Beck and Starflinger. Starflinger explained while reviewing Rodriguez's application for residency, he wanted to approve it because he "did not want to give Ms. Banuelos any excuse for her to join her son in a multiplicity of lawsuits." He asked Beck to review the application as it appeared Rodriguez did not meet the financial qualifications. According to Starflinger, when Rodriguez did not respond to the request to provide additional financial information, the Park declined her application.

Beck reviewed Rodriguez's application, which provided for a purchase price of $55,000. The application included a net worth statement of Rodriguez showing total assets of $1,273,300. The net worth statement did not show a source for the purchase price, so it appeared Rodriguez would be incurring additional debt to finance the purchase. Beck also reviewed Rodriguez's credit report, and it showed monthly loan payments of $5,112. But Rodriguez stated her gross monthly salary was $4,000, with rental income of $2,800. As a result, Beck sent a letter to Park management to transmit to Rodriguez asking for information he thought was necessary to assess her qualifications. Beck also declared to a conversation he had with Harry Madera, who was apparently an agent representing Rodriguez. Beck asked Madera where Rodriguez was getting the funds for the purchase. Madera stated Rodriguez was getting the money from her sister. Beck never heard back from Madera or Rodriguez, so on July 19, 2010, he drafted a letter to Rodriguez denying her application.

The record on appeal does not reflect the outcome of the motion for preliminary injunction, but we assume it was denied.[3]

---

[3] Otherwise, presumably the Attorney Defendants would rely on the trial court's granting of the preliminary injunction as

On January 10, 2011, a new buyer made an offer to purchase Banuelos's mobilehome for $51,000, which Banuelos accepted. The new buyer's application for residency was approved, and the sale closed February 28, 2011.

Following several demurrers and motions to strike, it appears the operative third amended complaint[4] filed April 4, 2011 was reduced to three causes of action against R22, Inc. dba Star Management (R22, served as Doe 1), the authorized agent working on behalf of the owner, 218, and Starflinger (served as Doe 2), the agent/representative of R22: (1) second cause of action for violation of Civil Code section 798.74; (2) ninth cause of action for intentional infliction of emotional distress; and (3) tenth cause of action for negligence. On these, R22 and Starflinger filed motions for summary judgment.

The trial court granted summary judgment as to each defendant. According to this Division's opinion in *Banuelos v. 218 Properties, LLC* (Sept. 3, 2013, B241645) [nonpub. opn.] (*Banuelos I*), the trial court found: "(1) as to the cause of action for violation of Civil Code section 798.74 and the derivative negligence claim, the undisputed evidence showed . . . Rodriguez cancelled her purchase of [Banuelos]'s mobile home because she

---

evidence they had probable cause to continue the Underlying Action. (See *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1011 [one way a defendant can negate absence of probable cause and defeat malicious prosecution claim is by showing interim victory such as granting of a preliminary injunction in the underlying case].)

[4] The first, second, and third amended complaints are not in the record on appeal. Nor are the trial court's minute orders sustaining the demurrers.

6

did not want to respond to the requests for further information and those requests were objectively reasonable; (2) as to the intentional interference with contract cause of action, it was undisputed . . . Rodriguez exercised her contractual right to cancel the purchase and . . . defendants were not strangers to the contract; (3) as to the interference with economic advantage cause of action, the undisputed evidence showed . . . the interference was not wrongful and the requests for additional information were objectively reasonable;[5] and (4) as to the intentional infliction of emotional distress cause of action, the undisputed evidence showed defendants did not engage in extreme or outrageous conduct and plaintiff did not suffer severe emotional distress." (*Banuelos I, supra,* B241645 at p. 6.)

Banuelos appealed, and a different panel of this Division affirmed in *Banuelos I.* The Division held, inter alia, "the defendants were well within their rights in demanding that the prospective purchaser located by [Banuelos] provide satisfactory evidence of an ability to pay the required park rent and charges. Civil Code section 798.74 allows park owners to refuse to approve mobile home purchasers for residency based on their 'lack of ability to pay park rent and charges.' " (*Banuelos I, supra,* B241695 at p. 9.)[6]

---

[5] It is unclear from the record on appeal where the interference with economic advantage and intentional infliction of emotional distress causes of action arose, given R22's and Starflinger's motions for summary judgment do not address them.

[6] This Division also affirmed on procedural grounds. *Banuelos I* explained, Banuelos's "arguments improperly rely on evidence to which objections were sustained. However,

7

II.    The Instant Action

    A.    *Complaint*

Six months after issuance of the remittitur in *Banuelos I,* on May 5, 2014*,* LAI, 218, R22, and Starflinger filed the instant action against Banuelos and the Attorney Defendants, alleging causes of action for malicious prosecution and defamation.

"The complaint alleged in relevant part:  the [Underlying Action] was terminated in LAI's favor.  Banuelos and her counsel lacked probable cause to initiate and prosecute the [Underlying Action], no reasonable attorney would have thought the claims were legally tenable, and there was a complete failure to investigate the facts before bringing suit.  The [Underlying Action] 'was predicated on the charge that [LAI and others] acted in concert to unreasonably, intentionally, and wrongfully refuse the transfer of mobile homes to [LAI and others] or their proxies.'  Had Banuelos and her counsel 'conducted any investigation whatsoever, they would have discovered that there was only one occasion—which occurred more than five years earlier, before Plaintiffs 218 . . . , LAI, and R22 even had any involvement with Park Granada—where the sale of a mobile home to a prospective

---

[Banuelos] does not challenge the court's rulings sustaining defendants' objections to this evidence.  As a result, any issues concerning the correctness of the court's evidentiary rulings have been waived and we consider all such evidence to have been properly excluded.  [Citation.]  [¶]  In addition, [Banuelos] does not address the numerous alternate bases for the trial court's rulings, including the court's conclusion that her separate statement was deficient and that [LAI] was not liable for the acts of 218 . . . .  Therefore, [Banuelos] has failed to show that summary judgment was improper." (*Banuelos I*, *supra*, B241645 at p. 12, fn. omitted.)

8

third party buyer was turned down before it was sold to an alleged "proxy" of Plaintiff Starflinger.'  Further, Banuelos and her counsel acted with malice, as evidenced by, inter alia, derogatory comments about Starflinger in the presence of others.  Finally, the cause of action for defamation was predicated on a June 2013 statement by Martin, in the presence of others, that Starflinger had been sued by the SEC for securities fraud.  'This statement was . . . indisputably false, as . . . Starflinger has never been sued by the SEC for securities fraud.'  Further, said statement was defamatory per se and was not privileged because it was not made in the course of a judicial proceeding." (*LA Investment v. Banuelos* (June 30, 2016, B260151) [nonpub. opn.] at p. 6 (*Banuelos II*).)

B.     *Special Motion to Strike and Banuelos II*

The Attorney Defendants filed a special motion to strike the complaint, and Banuelos joined.  The motion asserted, inter alia, LAI could not prevail on the malicious prosecution claim because the facts known as of the date of filing of the Underlying Lawsuit established probable cause as a matter of law.  The motion also argued LAI could not establish the element of malice and that Banuelos had a complete defense because she acted on the advice of counsel.

"In opposition, LAI argued a lack of probable cause can be established by showing either that the prior action was initiated without probable cause, or that it continued to be prosecuted after Banuelos learned it was not supported by probable cause." (*Banuelos II, supra,* B260151 at pp. 7–8.)  LAI further contended it could show Banuelos and the Attorney Defendants acted with malice and that Banuelos's invocation of the advice of counsel defense was premature.

9

The trial court denied the special motion to strike.

The Attorney Defendants appealed. A different panel of this Division reversed in part and remanded with directions to grant the motion as to the defamation claim, and otherwise affirmed in *Banuelos II*, *supra*, B260151 at page 28. This Division determined the trial court properly denied defendants' special motion to strike the cause of action for malicious prosecution.[7]

C.    *Trial*

With the agreement of counsel, the trial court dismissed plaintiffs 218 and R22 and agreed to Attorney Defendants' request to bifurcate the punitive damages phase of trial. It was also agreed argument regarding probable cause would be made to the court, not the jury, and the court would make a finding before the case was argued to the jury.

The case was tried in September 2019. On September 24, 2019, the trial court denied plaintiffs' motion for directed verdict and denied the Attorney Defendants' motion for nonsuit. The court found as a matter of law the Attorney Defendants had no probable cause to initiate the Underlying Action.[8] The court

---

[7] Our decision in *Banuelos II* cannot form the basis for a finding of probable cause or malice in the instant appeal. (See Code Civ. Proc., 425.16, subd. (b)(3).)

[8] On September 23, 2019, both sides filed requests for judicial notice, which the trial court stated it had "read and considered." The record on appeal does not contain the Attorney Defendants' request(s) for judicial notice. Plaintiffs supplemented the record on appeal to include the following requests for judicial notice dated: September 19, 2019; September 22, 2019; and October 1, 2019. Based on the timing of

10

stated, "I think this case was utterly lacking in probable cause from its beginning to its end and that no reasonable attorney would have maintained it." The court also found the two witnesses (Spix and Martin) who testified they thought what they did was supported by probable cause were "utterly lacking" in credibility, stating, "I found all three of the defendants' testimony [Banuelos was the third] to be combative and their refusal to answer straightforward questions in a straightforward manner contributes to the court's finding that they are lacking in credibility." The court found the only reason to commence or continue the underlying action was to harass the Park and Starflinger. "So the court finds that there was no probable cause to commence the case and certainly no probable cause to continue it."

On September 30, 2019, the jury returned its verdict. The jury found the Attorney Defendants acted primarily for a purpose other than succeeding on the merits of the claim and that their conduct was a substantial factor in causing plaintiffs harm.[9] The jury found the Attorney Defendants engaged in the conduct with malice, oppression, or fraud.

---

the court's comments, it appears the court "read and considered" plaintiffs' September 22, 2019 request. It contains the moving and opposing papers on the motion for preliminary injunction in the Kevin Action, and the moving and opposing papers on the motion for summary judgment in the Underlying Action.

[9] The jury found Banuelos did not act primarily for a purpose other than succeeding on the merits and was not a substantial factor in causing harm to any plaintiff.

11

The jury awarded compensatory damages representing attorney fees and costs in the sum of $171,465.09 and emotional distress damages in the sum of $10,000. The trial court added interest of $85,581.18 to the compensatory damages award. With respect to punitive damages, the jury awarded LAI punitive damages from Spix of $300,000 and from Martin $25,000. The jury awarded Starflinger punitive damages from Spix of $15,000 and from Martin $5,000.

Judgment was entered December 3, 2019. Following denial of their motion for judgment notwithstanding the verdict and motion for new trial, Attorney Defendants timely appealed.[10]

## CONTENTIONS

The Attorney Defendants contend (1) there was probable cause to prosecute the Underlying Action; (2) the evidence was insufficient to support the jury's finding of malice; (3) the compensatory damages award must be vacated and set aside because LAI and Starflinger did not pay anything for attorney

---

[10] We asked counsel to brief whether the March 4, 2020 notice of appeal was timely based on the notice of entry of judgment served by mail by the clerk of the superior court on December 3, 2019. We have reviewed the parties' letter briefs. We grant defendants' unopposed motion to augment the record on appeal filed January 7, 2022. We deem the clerk's certificate of mailing effective December 4, 2019, the date it was signed by the clerk. (See Code Civ. Proc., § 659, subd. (a)(2) [party intending to move for new trial shall file notice of intention to move for new trial within 15 days of "date of mailing notice of entry of judgment by the clerk of the court"].) Therefore, the time having been extended by 30 days, the notice of appeal was timely filed. (See Cal. Rules of Court, rule 8.104(a)(1)(A)-(B).)

12

fees and costs; and (4) the punitive damages awards are excessive as a matter of law.

## DISCUSSION

To state a cause of action for malicious prosecution, plaintiff must plead and prove the prior action (1) was commenced by or at the direction of defendant and was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 (*Sheldon Appel*).) A malicious prosecution suit may be maintained even if only some of the claims in the prior action lacked probable cause. (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 676.)

There is no dispute the Underlying Action was commenced by the Attorney Defendants and plaintiffs obtained a favorable termination in the Underlying Action. The issues on appeal concern probable cause, malice, and compensatory and punitive damages.

I.    The Trial Court Correctly Found the Attorney Defendants Had No Probable Cause to Initiate or Maintain the Underlying Action

The question whether defendant had probable cause for instituting the prosecution is always a matter of law to be determined by the trial court. (*Sheldon Appel*, *supra*, 47 Cal.3d at p. 875.) The question whether, on a given set of facts, there was probable cause requires a sensitive evaluation of legal principles and precedents, a task generally beyond the ken of lay jurors. (*Ibid.*) Malicious prosecution includes continuing to prosecute a lawsuit discovered to lack probable cause. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 970.) The reasonableness of

13

counsel's persistence in continuing to prosecute is a question of law to be decided on a case-by-case basis.  (*Ibid.*, fn. 9.)

Whether a reasonable lawyer would have thought the claim legally tenable—an objective inquiry—is a legal issue we review de novo.  (*Arcaro v. Silva & Silva Enterprises Corp.* (1999) 77 Cal.App.4th 152, 156; see *Hufstedler, Kaus & Ettinger v. Superior Court* (1996) 42 Cal.App.4th 55, 63 [where no disputed questions of fact relevant to probable cause issue, matter reviewed on appeal by de novo review].)

A party has probable cause to bring a lawsuit if, objectively viewed, its claims were legally tenable, meaning a reasonable attorney would conclude the underlying action was not totally and completely without merit.  (*Sheldon Appel*, *supra*, 47 Cal.3d at p. 885.)  "In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought.  A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him."  (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164–165.)

The Attorney Defendants asserted in the Underlying Action that LAI and Starflinger interfered with Banuelos's contract to sell her mobilehome by unreasonably refusing to approve a sale.  They also asserted the Beck declaration from the Kevin Action evidenced Rodriguez's ability to pay about $300 per month in rent.  In their opening brief, Attorney Defendants fail to differentiate between what they knew upon initiation of the

14

Underlying Action and what they learned after its inception.[11] Attorney Defendants offer the following evidence in support of their contention they had probable cause.

Banuelos testified Starflinger "didn't let me sell the mobile home" and "[h]e was not going to let me do it." Banuelos then told her attorneys all the facts as she knew them.

Spix testified at the time the Rodriguez sale fell through, he was aware the mobilehome residency laws permitted inquiry concerning the ability of a prospective tenant to pay rent. He agreed the law stated approval of a prospective tenant cannot be withheld if financial ability of the prospective tenant is established. However, he believed the Beck Letter was intrusive and requested more information than was permitted under the statute. Spix also testified the Notice sent to Rodriguez was a lie, because the condominium conversion had been denied for more than a month before the Notice was given. Spix testified one of the bases for his allegation the sale fell through was due to the Park's unreasonable conduct in not approving the sale to Rodriguez.[12]

---

[11] In their reply brief, Attorney Defendants touch on whether they had probable cause to continue the Underlying Action to a final judgment, but they fail to cite to the record on appeal throughout the reply. We consider the points waived. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 ["We are not required to search the record to ascertain whether it contains support for [appellant's] contentions"].)

[12] The Attorney Defendants represent, "Mr. Spix believed that Mr. Starflinger's request for information was a pretext for denying Ms. Rodriguez's application to rent" citing page 2606 of the reporter's transcript. Page 2606 does not reflect the referenced testimony.

The Attorney Defendants fail to address Spix's admission during his testimony that he initiated the Underlying Action to spur the closing of escrow and to free Banuelos from the Park. The Attorney Defendants also fail to address the requests for judicial notice the lower court relied on in reaching its conclusion the Underlying Action lacked probable cause.[13]

When they filed the Underlying Action, the Attorney Defendants had the exhibits to the complaint—the Notice, Beck Letter, and City of Carson Letter. None constitute probable cause to institute or continue the Underlying Action.

As for the Notice, in her testimony, Martin acknowledged Rodriguez viewed the prospect of conversion favorably. Therefore, a reasonable attorney would have concluded even if Attorney Defendants believed the Notice contained a lie, it did not cause Rodriguez any hesitation in pursuing a purchase of Banuelos's mobilehome.

As to the City of Carson Letter, the Attorney Defendants do not argue it legitimately formed a basis for initiating or continuing the Underlying Action.

The Beck Letter is another matter, but we do not believe it constituted probable cause to initiate the Underlying Action. The Beck Letter raised three concerns and requested additional information on each—Rodriguez's mortgage debt, the source of $55,000 in cash she was going to pay for the mobilehome, and the Park's rules prohibiting subletting, given Rodriguez disclosed her adult son would occupy the mobilehome.

---

[13] As previously noted, the Attorney Defendants did not supply us with their request(s) for judicial notice.

16

Spix testified the Beck Letter, rather than a request or phone call directly from management, was "sort of amping it up, sort of raising the intimidation factor. That got my eyebrows raised." Spix was also concerned about what Beck did not say in the letter, such as whether or not Rodriguez's credit report showed delinquencies. Spix testified the request to identify the source of Rodriguez's cash was not reasonable. But he had no idea whether, if Rodriguez was going to get a loan, it would affect her monthly payments. He thought she had the cash. He stated Beck's request was unreasonable because "[i]t's outside the statute. It's not related to a prior tenancy."

To address the reasonableness of concluding the Underlying Action was legally tenable, we turn to the law upon which the Attorney Defendants rely. In arguing plaintiffs interfered with Banuelos's contract to sell her mobilehome to Rodriguez, the Attorney Defendants cite the current version of Civil Code section 798.74, subdivisions (a) and (c), which was added in 2015 and amended in 2019.[14] However, the Underlying

---

[14] The current version of Civil Code section 798.74, subdivisions (a) to (d) reads in relevant part: "(a) The management may require the right of prior approval of a prospective purchaser of a mobilehome that will remain in the park. [¶] (b) [¶] (1) A selling homeowner or their agent shall give notice of a sale of a mobilehome that will remain in the park to management before the close of the sale. [¶] (2) Management shall, within 15 days, provide the seller and the prospective purchaser both of the following, in writing, upon receiving the notice required in paragraph (1): [¶] (A) The standards that management customarily utilizes to approve a tenancy application, including the minimum reported credit score from a consumer credit reporting agency that management requires for approval. [¶] (B) A list of all documentation that management

17

Action was filed in 2010, so the reasonableness of Attorney Defendants' actions must be viewed with reference to the 2010 version of Civil Code section 798.74.[15]

As it read in 2010, Civil Code section 798.74, subdivision (a) provided, "[t]he management may require the right of prior approval of a purchaser of a mobilehome that will remain in the

---

will require to determine if the prospective purchase will qualify for tenancy in the park.  [¶]  (c) Management shall not withhold approval from a prospective purchaser of a mobilehome unless any of the following apply:  [¶]  (1) Management reasonably determines that, based upon the purchaser's prior tenancies, they will not comply with the rules and regulations of the park.  [¶] (2) The purchaser does not have the financial ability to pay the rent, estimated utilities, and other charges of the park.  [¶] (3) The purchaser has committed fraud, deceit, or concealment of material facts during the application process.  [¶]  (d) In determining whether the prospective purchaser has the financial ability to pay the rent and charges of the park pursuant to paragraph (2) of subdivision (c), the management may require the prospective purchaser to document the amount and source of their gross monthly income or means of financial support. However, management shall not require the prospective purchaser to submit any of the following:  [¶]  (1) Documentation beyond that disclosed pursuant to subparagraph (B) of paragraph (2) of subdivision (b).  [¶]  (2) Copies of any personal income tax returns."

[15] Therefore, the Attorney Defendants' argument there is no evidence Rodriguez was disapproved because she would not comply with the rules and regulations of the park or because she had committed fraud, deceit, or concealment of material facts, is irrelevant and based on an incorrect statement of the law as it existed in 2010.

18

park and that the selling homeowner or his or her agent give notice of the sale to the management before the close of the sale. *Approval cannot be withheld if the purchaser has the financial ability to pay the rent and charges of the park* unless the management reasonably determines that, based on the purchaser's prior tenancies, he or she will not comply with the rules and regulations of the park. In determining whether the purchaser has the financial ability to pay the rent and charges of the park, the management shall not require the purchaser to submit copies of any personal income tax returns in order to obtain approval for residency in the park. However, *management may require the purchaser to document the amount and source of his or her gross monthly income or means of financial support.*" (Civ. Code, former § 798.74, subd. (a), added by Stats. 1990, ch. 645, § 1, pp. 3131–3132, italics added.)

For context, we turn now to the Mobilehome Residency Law (MRL) (Civ. Code, § 798 et seq.). Mobilehome evictions differ significantly from conventional residential evictions. The MRL regulates relations between the owners and residents of mobilehome parks. (*SC Manufactured Homes, Inc. v. Canyon View Estates, Inc.* (2007) 148 Cal.App.4th 663, 674.) The MRL also regulates the sales and transfers of mobilehomes in the park, providing specified protections for management, selling homeowners, purchasers, and occupants. (*Ibid.*; see Civ. Code, § 798.70 et seq.)

When enacting the MRL, the Legislature expressly found, " 'because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of landscaping or lot preparation, it is necessary that the owners of mobilehomes

19

occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter.' " (*Rich v. Schwab* (1998) 63 Cal.App.4th 803, 813; see Civ. Code, § 798.55, subd. (a).)  The MRL "provide[s] mobilehome owners unique protection by requiring they be given greater notice of rent increases and other changes in the terms of their tenancy and by limiting the circumstances under which they may be evicted."  (*Ibid.*; see Civ. Code, §§ 798.30, 798.55.)

The resident owner is a " '[h]omeowner,' " as defined in Civil Code section 798.9, who has a " '[t]enancy,' " as defined in Civil Code section 798.12.  However, a nonowner resident of a mobilehome does not enter into a tenancy agreement with park management, so he or she is not a homeowner but instead a " '[r]esident,' " as defined in Civil Code section 798.11.

As a result of the difficulties mobilehome parks may experience evicting a homeowner or resident, the law allows mobilehome park managers to require potential homeowners and residents to strictly comply with financial and other requirements prior to being accepted as a tenant.  This was the precise issue with the Beck Letter.  Former section 798.74 permits inquiry into gross monthly income or means of financial support.  There was nothing overreaching about the Beck Letter, which requested a schedule of real estate owned, mortgage statements, income and expense detail, and verification of funds to complete the $55,000 purchase.  The trial court determines all these items constitute documentation as to "the amount and source of his or her gross monthly income or means of financial support." (Civ. Code, former § 798.74, subd. (a).)  No reasonable

20

attorney would have imputed nefarious meaning to the Beck Letter.

In addition to lacking probable cause to initiate the Underlying Action, the Attorney Defendants also lacked probable cause to maintain it. The Attorney Defendants have not addressed the timeline of events in the Underlying Action, but the trial court has gleaned the following from the record on appeal.

The Attorney Defendants were on notice the Underlying Action lacked merit as early as July 29, 2010, when plaintiffs served their opposition to Kevin's motion for preliminary injunction. Banuelos sold her mobilehome in February 2011. Two months later, on April 4, 2011, Banuelos filed her third amended complaint. On July 26, 2011, the Attorney Defendants sent an offer to compromise under Code of Civil Procedure section 998 in the Underlying Action offering to have judgment entered for Banuelos in the sum of zero, with "each party to bear its own costs and attorney's fees." Plaintiffs filed their motion for summary judgment in December 2011, and it was granted on April 10, 2012, with the trial court finding the requests for further information in the Beck Letter were "objectively reasonable as shown by undisputed evidence."

Spix testified he could not dismiss the case at the time the offer to compromise was served without subjecting Banuelos to attorney fees. The trial court infers from this statement Banuelos was in too deep at that point, and yet the litigation continued. Knowing the MRL provides for attorney fees to the prevailing party (Civ. Code, § 798.85; see *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc.*, *supra*, 148 Cal.App.4th at p. 673) should have motivated the Attorney Defendants to

proceed with added caution at all stages of the litigation. The court concludes a reasonable attorney would have known there was little to zero chance of prevailing in the litigation after losing on summary judgment, yet the Attorney Defendants pursued the case through an unsuccessful appeal.[16] No reasonable attorney would have continued to prosecute a lawsuit with potential damages of only $4,000 (the difference between Rodriguez's offer of $55,000 and the subsequent sales price of $51,000) and exposure to an award of attorney fees.

We conclude there was no probable cause to initiate or maintain the Underlying Action. The trial court did not err in its determination.

---

[16] The trial court does not suggest the grant of summary judgment alone supports a finding no probable cause existed. (Compare *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 747 [defense summary judgment on underlying claim does not establish lack of probable cause as a matter of law]; with *Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767, 776 ["California courts have long embraced the so-called interim adverse judgment rule, under which 'a trial court judgment or verdict in favor of the plaintiff or prosecutor in the underlying case, unless obtained by means of fraud or perjury, establishes probable cause to bring the underlying action, even though the judgment or verdict is overturned on appeal or by later ruling of the trial court' "].)

22

II.    Substantial Evidence Supports the Jury's Finding of Malice and Award of Compensatory Damages

A.    *The Attorney Defendants Waived Their Argument There Is No Substantial Evidence to Support the Jury's Malice Finding*

We review the jury's finding of malice for substantial evidence.  (*Sheldon Appel*, *supra*, 47 Cal.3d at p. 875 [malice is always a question of fact for the jury]; see *George F. Hillenbrand, Inc. v. Insurance Co. of North America* (2002) 104 Cal.App.4th 784, 816 [our task on review of jury verdict for malicious prosecution is to review entire record to determine whether substantial evidence supports jury's findings].)

When a finding of fact is attacked on the ground there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support it.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  It is well established a reviewing court starts with the presumption the record contains evidence to sustain every finding of fact.  (*Ibid.*)

On appeal challenging sufficiency of the evidence, appellant's opening brief must set forth all the material evidence on point, not merely state facts favorable to appellant.  (See *Foreman & Clark Corp. v. Fallon*, *supra*, 3 Cal.3d at p. 881.)  The burden to provide a fair summary of the evidence grows with the complexity of the record.  (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739.)  When appellant's opening brief states only favorable facts, ignoring evidence favorable to respondent, the appellate court may treat the substantial evidence issues as waived and presume the record contains evidence to sustain

23

every finding of fact. (See *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409–410 [appellant cannot shift burden of presenting all material evidence to respondent, nor is appellate court required to undertake independent examination of record when appellant has shirked responsibility in this respect].)

Moreover, an appellant's opening brief must provide a summary of the significant facts limited to matters in the record. (Cal. Rules of Court, rule 8.204(a)(2)(C).) Every brief must support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears. (Cal. Rules of Court, rule 8.204(a)(1)(C).) The appellate court is not required to search the record on its own seeking error. If a party fails to support an argument with the necessary citations to the record, the argument will be deemed waived. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246; see *Estate of Palmer* (1956) 145 Cal.App.2d 428, 431 [attack on evidence without fair statement of evidence entitled to no consideration when apparent substantial amount of evidence was received on respondent's behalf].)

Here, the reporter's transcript spans over 5300 pages and the appendices exceed 2800 pages, including nearly 1500 pages of court-filed documents omitted in the Attorney Defendants' appendix. The missing documents supplied by plaintiffs in their appendix contain legally significant facts necessary to our determination of the issues raised on appeal. In addition to omitting from the record on appeal substantial portions of the trial court record, in their opening brief, the Attorney Defendants consistently fail to include record cites for several assertions of fact in their statement of facts and never once include a reporter's transcript record cite in their argument sections. This pattern is

24

repeated throughout their reply brief where not a single citation to the record on appeal can be located in its 29 pages. On a lengthy (over 8000 pages) and complex (11 years of litigation history) record such as that before us, the failure is particularly acute.

The Attorney Defendants failed to provide an adequate record for our substantial evidence review and further failed to include adequate record cites for their assertion the evidence was insufficient to support the jury's finding of malice. Consequently, the claim is waived, and we presume the record contains evidence to sustain the jury's finding of malice. (See *Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 248.)

B.     *Substantial Evidence Supports the Jury's Award of $171,465.09 in Compensatory Damages*

We review the jury's determination of compensatory damages for substantial evidence. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614.)

The Attorney Defendants concede damages potentially recoverable in a malicious prosecution action include out of pocket expenditures such as attorney fees and other legal fees. (See *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59 [measure of compensatory damages for malicious prosecution of a civil action includes attorney fees and court costs for defending the prior action and compensation for emotional distress, mental suffering and impairment to reputation proximately caused by the initiation and prosecution of the action].)

Here, the parties stipulated the total amount of attorney fees and costs plaintiffs incurred in the Underlying Action was $171,465.09. Nevertheless, the Attorney Defendants contend there is no evidence LAI or Starflinger (as opposed to dismissed

plaintiffs 218 and R22) paid or incurred any liability for attorney fees and costs generated in defense of the Underlying Action. They contend R22 paid attorney fees for LAI and only the entity that has been damaged has standing to bring a claim for such an expense. Further, even if LAI or Starflinger was, at one time, obligated to pay attorney fees and costs in the Underlying Action, no such obligation existed at the time of trial, because, according to the Attorney Defendants, under Civil Code section 1474, "[p]erformance of an obligation, by one of several persons who are jointly liable under it, extinguishes the liability of all."

The Attorney Defendants are wrong. Civil Code section 1474 applies to codefendants who are jointly liable for a judgment. (See *Salter v. Lombardi* (1931) 116 Cal.App. 602, 604 [when a codefendant pays the judgment, it is paid for all purposes].) To " 'incur' " a fee is to become liable for it. (*Trope v. Katz* (1995) 11 Cal.4th 274, 280.) It is not necessary for a party to actually pay for fees incurred. (See *Lolley v. Campbell* (2002) 28 Cal.4th 367, 371 [rejecting contention attorney fees "incurred" means only fees litigant actually pays or becomes liable to pay from his or her own assets].)

Starflinger testified all the attorney fees in the Underlying Action were paid through LAI but were actually funded from Thomas Heinemann, the owner of LAI. He said R22 sent the checks to the lawyers, but 218, which was owned by LAI, reimbursed R22. Starflinger testified he was personally responsible to pay legal fees, but he was reimbursed by 218.

The Attorney Defendants cannot escape from paying damages because Heinemann, as benefactor, duly paid an attorney fees bill presented to his company. There is no evidence Heinemann considered his payments to the lawyers who

26

defended plaintiffs in the Underlying Action a satisfaction of judgment in this case. The fees were paid, and the jury affixed liability for them squarely on the shoulders of the Attorney Defendants, not Heinemann, plaintiffs, 218 or R22. The Attorney Defendants' argument defies logic and reason, and attempts to shift their liability to an innocent party.

Finally, the trial court denied the Attorney Defendants' motion for new trial which argued, inter alia, compensatory damages were excessive. The appellate court ordinarily defers to the trial court's denial of a motion for new trial based on excessive damages, because of the trial judge's greater familiarity with the case. (*Rufo v. Simpson*, *supra*, 86 Cal.App4th at p. 614.) The appellate court will interfere with the jury's determination only when the award is so disproportionate to the injuries suffered that it shocks the conscience and virtually compels the conclusion the award is attributable to passion or prejudice. (*Id*. at p. 615.) No such situation is present here.

III. The Jury's Award of Punitive Damages Was Not Excessive as a Matter of Law

The parties stipulated Spix had a net worth of $1,000,000 and Martin had a net worth of $125,000. The jury awarded punitive damages of $300,000 against Spix payable to LAI and $15,000 against Spix payable to Starflinger. The jury awarded punitive damages of $25,000 against Martin payable to LAI and $5,000 against Martin payable to Starflinger.

A reviewing court will reverse an award of punitive damages only when the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 (*Neal*).)

27

We review the jury's determination of punitive damages for substantial evidence.  (*Id.* at p. 922; see *George F. Hillenbrand, Inc. v. Insurance Co. of North America*, *supra*, 104 Cal.App.4th at p. 816.)

Factors to consider in determining whether a punitive damages award is excessive as a matter of law or the result of passion or prejudice include (1) the degree of reprehensibility of defendant's misconduct; (2) the relationship between compensatory and punitive damages; and (3) defendant's financial condition.  (*Neal*, *supra*, 21 Cal.3d at p. 928.)

The Attorney Defendants address only the third factor in their opening brief.  They contend the jury's award of punitive damages against each attorney was excessive as a matter of law, because the "normal limit" of an award of punitive damages is ten percent of the person's net worth.  The Attorney Defendants rely on *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498 and *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566.

The jury instruction on punitive damages correctly instructed, "[t]here is no fixed formula for determining the amount of punitive damages."  Both cases relied on by the Attorney Defendants are factually distinguishable, and, consistent with the jury instruction, neither case stands for a bright line rule that punitive damages in excess of 10 percent of defendant's net worth are excessive as a matter of law.  There is no such rule.

In *Storage Services v. Oosterbaan*, *supra*, 214 Cal.App.3d at page 515, a punitive damages award of $75,000 representing 33 percent of defendant's net worth, which amount also exceeded his gross income for the year of trial, was disproportionate.  Similarly, in *Michelson v. Hamada*, *supra*, 29 Cal.App.4th at

28

page 1596 a punitive damages award of $1,250,000 in light of defendant's net worth of $4,394,500 was excessive, as it represented 28 percent of his net worth.

But the issue does not turn on whether the award exceeds some specified percentage of the defendant's net worth. There is no legal requirement that punitive damages must be measured against a defendant's net worth. (*Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582–583.) The key determination is whether the amount of damages exceeds the level necessary to properly punish and deter. (*Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1299.) The function of deterrence will not be served if a defendant's wealth allows him or her to absorb the award with little or no discomfort. (*Neal, supra,* 21 Cal.3d at p. 928.)

We conclude the award of $315,000 total punitive damages against Spix and $30,000 total punitive damages against Martin do not exceed a level necessary to properly punish and deter.

The remaining two *Neal* factors are not adequately addressed by the Attorney Defendants. In their reply brief, they contend the second factor—the relationship between compensatory and punitive damages—does not apply in this case. As to the first factor—the degree of reprehensibility of the defendants' misconduct—the Attorney Defendants rebuff plaintiffs' reliance on *Rufo v. Simpson, supra,* 86 Cal.App.4th at page 573 by arguing the murder of two individuals has a far higher level of reprehensibility than failure to evaluate the merits of a lawsuit accurately.

The Attorney Defendants miss the mark. When analyzing the degree of reprehensibility, the appellate court must examine

29

"the particular nature of the defendant's acts *in light of the whole record.*" (*Neal, supra,* 21 Cal.3d at p. 928, italics added.) Yet the Attorney Defendants have failed to present "the whole record" to this court, which, when coupled with their failure to show insufficiency of the evidence on malice, renders the issue waived on substantial evidence review. (See *Huong Que, Inc., supra,* 150 Cal.App.4th at pp. 409–410.)

The Attorney Defendants have failed to establish the punitive damages award was excessive as a matter of law.

## DISPOSITION

The judgment is affirmed. LA Investments, LLC, and Peter Starflinger are awarded their costs on appeal.

NOT TO BE PUBLISHED.


KNILL, J.[*]


We concur:



LAVIN, Acting P. J.



EGERTON, J.

---

[*] Judge of the Superior Court of Orange County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LA INVESTMENTS, LLC, et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> RICHARD SPIX et al., <br><br> Defendants and Appellants. | B304734 <br> (Los Angeles County <br> Super. Ct. No. BC544662) <br><br> ORDER MODIFYING OPINION <br> AND CERTIFYING FOR PARTIAL <br> PUBLICATION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 9, 2022 be modified as follows:

1.  On page 20, fifth sentence of the last paragraph, the word "determines" is changed to "determined" so it reads:

The trial court determined all these items constitute documentation as to "the amount and source of his or her gross monthly income or means of financial support."

---

**\*** Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part III of the Discussion.

2. On page 21, last sentence of the first full paragraph, the words "the trial court has" are changed to "we have" so it reads:

The Attorney Defendants have not addressed the timeline of events in the Underlying Action, but we have gleaned the following from the record on appeal.

3. On page 21, second sentence of the last paragraph, the words "The trial court infers" are changed to "We infer" so it reads:

We infer from this statement Banuelos was in too deep at that point, and yet the litigation continued.

4. On page 22, first full sentence of the first paragraph, the words "The court concludes" are changed to "We conclude" so it reads:

We conclude a reasonable attorney would have known there was little to zero chance of prevailing in the litigation after losing on summary judgment, yet the Attorney Defendants pursued the case through an unsuccessful appeal.

5. On page 22, footnote 16, first sentence, the words "The trial court does not" are changed to "we do not" so it reads:

We do not suggest the grant of summary judgment alone supports a finding no probable cause existed.

There is no change in the judgment.

The opinion was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partially published in the Official Reports and as modified, it is so ordered.

_____

KNILL, J.*             LAVIN, Acting P. J.             EGERTON, J.

_____

* Judge of the Superior Court of Orange County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

3